# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 16, 2012

No. 10–20023

Lyle W. Cayce
Clerk

NATIONAL BUSINESS FORMS & PRINTING, INC., doing business as Graphxonline.com, doing business as Quickstickers.com,

Plaintiff–Appellant
Cross–Appellee

v.

FORD MOTOR COMPANY,

Defendant–Appellee
Cross–Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before WIENER, GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

National Business Forms & Printing, Inc. ("NBFP") appeals the district court's partial grant of summary judgment for Ford Motor Company ("Ford"); the district court's final judgment holding NBFP liable for trademark infringement; and the district court's order denying NBFP's motion to amend its complaint. Ford cross-appeals from the district court's final judgment, disputing that court's findings on infringement, dilution, and attorney's fees. For the reasons that follow, we AFFIRM in part and REVERSE in part.

No. 10–20023

## I

NBFP is a small commercial printer that makes custom signs, stickers, banners, decals, and other advertising materials. NBFP's inventory consists only of the raw materials needed to process orders as they are placed; NBFP prefabricates nothing. Along with a retail outlet in Navasota, Texas, NBFP maintains two websites that allow customers to place orders online. Each website contains a bank of corporate logos and other clip art available for use as part of NBFP's custom design and printing services. To access NBFP's online catalog, a visitor must first enter a specific corporate name and then click "Go" or "Enter". This query then returns corporate logos corresponding to the search term. The underlying suit focuses on NBFP's use of fourteen of Ford's trademarked logos in this manner.

NBFP's websites both state that "By clicking Go or Enter, you agree that any artwork submitted or requested by you is a representation and warranty to us that you have written authorization, if needed, to order its reproduction." The websites also declare in red lettering that NBFP "is not affiliated with, licensed by, or endorsed by any company," and that the product logos previewed on the websites are "trademarks of their respective companies, and are provided for accurate identification and reproduction for authorized users."

This case began shortly after Ford sent a cease-and-desist letter to NBFP, demanding that NBFP pay $5,000 in damages and refrain from using Ford's trademarks on its websites. NBFP sued Ford in Texas state court, seeking a declaratory judgment that its online printing operations did not infringe Ford's trademark rights. Ford removed to the U.S. District Court for the Southern District of Texas and raised counterclaims of trademark infringement, counterfeiting, dilution and false designation of origin under federal law and trademark infringement under state law. Ford soon moved for summary judgment on all claims.

No. 10–20023

In evaluating Ford's motion, the district court segregated NBFP's alleged infringing uses into four categories: (i) advertising materials bearing the Ford marks and printed at the request of Ford's authorized dealers; (ii) advertising materials bearing the Ford marks and printed for independent used car dealers having no affiliation with Ford; (iii) a custom decal bearing the Ford oval logo alongside two other domestic automakers' corporate marks, displaying the term, "NO BIG 3 BAILOUT"; and (iv) a residual category of products—decals, stickers, banners, signs, license plate frames, and other promotional materials—that NBFP offered for design and sale on its website to which the Ford marks could be attached.

The district court denied summary judgment on the first two categories of uses because Ford failed to meet its burden on summary judgment. The district court also denied Ford summary judgment on the third category of uses, finding that NBFP's use of Ford's trademarked logo threatened no likelihood of confusion or dilution, and, further, was protected by the fair-use doctrine. The district court further found that NBFP was entitled to declaratory judgment that the "NO BIG 3 BAILOUT" decal did not constitute actionable infringement or dilution. The district court granted summary judgment for Ford only on the fourth category of products and entered a permanent injunction targeting this category of products, enjoining NBFP from

> performing, without authorization from Ford or its licensees, all of the following: advertising for sale, displaying on the internet, offering for sale on the internet, manufacturing, producing, transferring, consigning, selling, shipping, or otherwise moving in commerce any and all goods, decals, stickers, banners, packaging, products, or other materials that embody any of Ford's marks.[1]

The district court did not reach Ford's claim of dilution as to this category of uses.

---

[1] NBFP does not appeal the scope of this injunction.

3

No. 10–20023

The remaining claims proceeded to a three-day bench trial. At trial, the district court found that: (1) NBFP did not infringe Ford's marks by selling Ford's trademarked products to authorized Ford dealers; (2) NBFP infringed Ford's mark by selling similar merchandise to three non-affiliated used car dealerships; and (3) NBFP did not dilute Ford's marks because it had not used the Ford oval or Ford script logos to identify or distinguish its goods or services. The district court awarded Ford statutory damages for its successful infringement claims but denied its request for attorney's fees. After trial, the district court denied NBFP's motion to amend its complaint to add an antitrust claim, which NBFP alleged was tried by consent. The court then entered judgment to reflect these rulings. The parties cross-appealed.

NBFP's and Ford's appeals center on their competing views of the district court's findings on Ford's federal claims of trademark infringement and dilution and the district court's denial of Ford's attorney's fees.[2] NBFP also contests the

---

[2] NBFP asserts on appeal that the Lanham Act's innocent infringer exception exculpates it from liability on infringement, pressing policy-based arguments that reveal its misunderstanding that the exception offers printers full immunity for their acts. *See* 15 U.S.C. § 1114(2)(A) ("[T]he owner of the right infringed . . . shall be entitled as against such infringer . . . only to an injunction against future printing."). The district court held that this exception does not apply because NBFP failed to show its infringement was objectively reasonable. *See Dial One of Mid-South, Inc. v. BellSouth Telecommc'ns, Inc.*, 269 F.3d 523, 526 (5th Cir. 2001) ("[T]he proper standard for evaluating whether an infringer is innocent is objective reasonableness."). The district court reasoned that "NBFP's blind reliance on . . . 'check the box' representations from a universe of unknown internet purchasers affords no objectively reasonable basis for an honest belief that these purchasers are in fact authorized to order Ford's marks from NBFP." *Nat'l Bus. Forms, Inc. v. Ford Motor Co.*, No. 08–1906, 2009 WL 3570387, at *6 (S.D. Tex. Oct. 30, 2009). Because NBFP does not minimally show that the district court clearly erred in awarding Ford damages, it has failed to show that the innocent infringer applies. *See Dial One*, 269 F.3d at 527 (The question of whether NBFP is an innocent infringer "is a question of fact, which we review only for clear error.").

NBFP possibly disputes the district court's findings on fair use and other defenses it claims to have raised. NBFP has waived these issues through its failure to meaningfully address them in its briefing. *See* FED. R. APP. P. 28(a)(9)(A); *Alameda Films SA de CV v. Authors Rights Restoration Corp., Inc.*, 331 F.3d 472, 483 n.34 (5th Cir. 2003).

No. 10–20023

district court's denial of its motion to amend its complaint.  We turn first to their varied contentions on infringement.

## II

## A

The Lanham Act provides

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1) (2006).

To prevail on a claim of trademark infringement under the Lanham Act, Ford must show (1) Ford possesses a valid mark; and (2) NBFP's use of Ford's trademarks creates a likelihood of confusion as to source, affiliation, or sponsorship.[3]  *See id.; Elvis Presley Enter., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).  "[T]he mere reproduction of a trademark does not constitute trademark infringement if there is no likelihood of confusion."  4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25.28 (4th ed. 2009).  A "likelihood of confusion" means that confusion is not just possible, but probable.  *Bd. of Supervisors for LSU A&M Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008).  Moreover, "[c]ontext is especially critical," and we must "consider the marks in the context that a customer perceives them in the marketplace."  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485 (5th Cir. 2004).  "Prominent and pervasive use of a mark will suggest affiliation, but mere reference to a marked product will not."  *Id.*

---

[3]  NBFP does not dispute that Ford possesses a valid mark.

No. 10–20023

In determining whether a likelihood of confusion exists, we often consider these "digits of confusion":  (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. *Capece*, 141 F.3d at 194.  "Courts also consider (8) the degree of care exercised by potential purchasers." *Smack Apparel*, 550 F.3d at 478.  The "digits of confusion" are not exhaustive, and no single factor is dispositive. *Id.*  "Actual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 204.

Likelihood of confusion is a question of fact that we review for clear error. *Capece*, 141 F.3d at 196.  But if the trial court's finding on the likelihood of confusion is "inextricably bound up" in, or infected by, the lower court's erroneous view of the law, we may conduct a *de novo* review of the record.  *Id.*

## B

## 1

In appealing the district court's partial grant of summary judgment, NBFP contests the district court's finding that NBFP infringed Ford's marks by offering on its website products for design and sale to which Ford marks could be attached.

The district court found that nearly every digit of confusion confirmed the likelihood of confusion between Ford's products and those NBFP offered.  Indeed, it was not seriously disputed before the district court or on appeal that (1) Ford's marks are strong; (2) NBFP's products consist of exact copies of Ford's marks; (3) these products are exact copies of products sold by Ford and its licensed marketers; (4) NBFP's products directly compete with products sold by Ford and their licensed marketers, and competition occurs in a relatively small market of

6

No. 10–20023

buyers; (5) these products are sold on the internet by NBFP, Ford, and Ford's licensees; (6) NBFP intentionally copied Ford's marks and sold Ford-marked products intending to take advantage of the popularity of Ford's marks. Further, the district court also found that (7) Ford offered no evidence of actual confusion or (8) neither party offered any evidence of the degree of care exercised by purchasers. The district court also found that NBFP's disclaimers did nothing to dispel post-purchase confusion.

In granting summary judgment on this category of marks, the district court also observed that NBFP offered no evidence to refute Ford's proof of infringement and only raised four inapplicable defenses. Even on appeal, NBFP fails to adequately target the aspects of the district court's grant of summary judgment it believes warrant our reversal. NBFP has therefore waived this issue through its failure to meaningfully address it in its briefing. *See* FED. R. APP. P. 28(a)(9)(A); *Alameda Films SA de CV v. Authors Rights Restoration Corp., Inc.*, 331 F.3d 472, 483 n.34 (5th Cir. 2003); *see also supra* footnote 2.

## 2

Next, we consider NBFP's challenge to the district court's finding that NBFP's sale of products bearing the Ford marks to three independent used car dealers constituted trademark infringement.

After a three-day bench trial, the district court entered judgment for Ford, finding NBFP liable for trademark infringement in its sales of products bearing the Ford marks to three independent used car dealerships. Unlike NBFP's sales of products to authorized Ford dealerships—which included decals, signs, stickers, and license plate frames adorned with the Ford marks—NBFP's sales of products to the used car dealerships were more limited in scope. The district court found that NBFP sold the following:

1) to Greenspoint Dodge Used Car Sales

No. 10–20023

a) a printed sticker that consisted of the phrase, "USED CAR CENTER," above the Ford Oval and the Mercury logo, together with the Dodge Ram logo, Jeep logo, GMC logo, Chevrolet bow tie logo, and Chrysler five-point star;

b) a printed banner with the text, "USED TRUCK BLOWOUT!" above the Ford Oval, the Chevrolet bow tie logo, and the Dodge Ram logo.

2) to Tomball Dodge

a) one printed vinyl decal with the text "USED TRUCK CENTER"; and

b) one printed vinyl decal consisting of the Dodge Ram logo, the Chevrolet bow tie logo, the Ford Oval, and the GMC logo.

3) to North Freeway Auto World

a) a license plate insert with the North Freeway Auto World logo in the center, surrounded by the trademarked logos of various automakers: Chrysler's five-point star, the Dodge Ram logo, the Jeep logo, the Ford Oval logo, the Mercury logo, the GMC logo, and the Chevrolet bow tie logo.

The district court found as fact that these promotional materials displayed the Ford logos and marks "in a manner that is likely to cause confusion among the public" and concluded as a matter of law that the promotional materials described above "use Ford's marks in a manner likely to confuse consumers on whether Ford endorsed or approved those businesses' sales of Ford vehicles." We disagree.

"[T]he particular context in which the mark appears must receive special emphasis." *Scott Fetzer Co.*, 381 F.3d at 485. The context in which the Ford

marks appear in the promotional materials described above makes the likelihood of consumer confusion negligible. The promotional products presented Ford's trademarks along with several other domestic automakers' corporate logos—anywhere from three to seven. With the exception of Mercury, these rival automakers all compete with Ford in both new and used automobile sales. The grouping of several competitors extinguishes any possible confusion, particularly where nothing in the district court's findings or in the record suggests that these used car dealers displayed the Ford marks elsewhere on their lots or showroom floors.

And "[i]n assessing the likelihood of confusion to the public," we are to consider "the typical buyer exercising ordinary caution." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979); *see Ky. Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 389 & n.26 (5th Cir. 1977) ("We analyze the confusion issue, of course, in terms of the product's typical buyer."). Ford's emphasis on the potential of confusion, however, does not convince us that the typical consumer likely would perceive that Ford endorsed or approved this diverse array of corporate logos, particularly at dealerships operating under the names "Greenspoint Dodge Used Car Sales" and "Tomball Dodge." While it is not implausible that the least sophisticated consumer mistakenly might deduce that Ford approved these dealerships' use of Ford's marks based on the promotional products described above, we are not convinced that this possibility is likely for the typical consumer. The district court clearly erred in finding otherwise. There is no likely threat of consumer confusion as to this class of NBFP's products sold to Greenspoint Dodge Used Auto Sales, Tomball Dodge, and North Freeway Auto World.

No. 10–20023

**3**

We next review the district court's finding at trial that NBFP's work in filling orders for several Ford dealerships did not constitute trademark infringement.

The district court found that these dealers' use of NBFP's printed materials was not likely to, and did not, "cause any confusion or mistake . . . [or] deceive anyone about the genuine Ford products" and services that the authorized dealers traded in.  The district court's judgment rests on its factual finding that the dealers had Ford's consent "to use the Ford marks and trade names in printed materials in dealing with Ford's products, without constraint upon the Ford Dealers as to where they purchased the printed materials."  Ford disputes this finding as error.

The Ford Sales and Service Agreement ("SSA") is an agreement between Ford and its authorized dealers that governs the dealers' use of the Ford marks and trade name, among other things.  The SSA states that

> The Dealer shall not use any trademark or trade name used or claimed by the Company . . . in connection with any business conducted by the Dealer other than in dealing in COMPANY PRODUCTS to which such trademark or trade name refers, and then only in the manner and form approved by the Company.

Based on this provision, the district court found that Ford's authorized dealers were free to contract with any printers of their choosing so long as the printed materials complied with the SSA's "manner and form" requirement.

As all parties and the district court agreed, the *Ford Oval Owners Manual* informs the SSA's "manner and form" requirement.  The *Manual* outlines the proper use of the Ford Oval mark in visual media:  "If you are an authorized dealer or agency working on behalf of an authorized dealer, you may use the Oval provided you follow these guidelines." *Ford Oval Owners Manual* § 1.0. The Ford Oval "should be used in all visual media such as advertising,

No. 10–20023

merchandise, [and] promotional materials . . . ." *Id.* § 1.1.  The *Manual* does not direct how Ford's dealers are to meet their advertising and visual media needs; it neither requires dealers to purchase advertising materials through Ford-licensed printers, nor prohibits them from ordering these materials from outside sources.

Ford contends that the SSA does, in fact, provide guidance on how its authorized dealers can satisfy their advertising needs.  Ford notes that the term, "COMPANY PRODUCTS," is defined in the SSA and is limited to those cars, parts, and accessories "as from time to time are offered for sale by the Company to all authorized Ford dealers . . . plus such other products as may be offered for sale by the Company to the Dealer from time to time."  Ford suggests that it will meet its dealers' advertising needs through promotional materials "offered for sale by the Company to the Dealer from time to time."  We reject Ford's reading of the SSA.[4]

Ford stresses that the terms of the trademark license circumscribe a trademark licensee's right to use a protected mark.  We do not disagree, but, more important, we do not find that the authorized Ford dealers exceeded the scope of their licenses here.  Like the district court, we find that under the SSA, Ford's authorized dealers were free to meet their  advertising needs through any vendors of their choosing provided that such printed materials complied with the SSA's manner and form requirements.  We likewise perceive no clear error in the district court's finding that the Ford dealers' use of NBFP's printed materials was unlikely to result in consumer confusion or mistake as to the authenticity of the goods and services that the Ford dealers traded in.

---

[4] We likewise reject Ford's suggestion that the SSA requires all authorized dealers to meet their advertising needs through Ford-licensed printers.  This position is dubious on this record, which shows that Ford has licensed only six printers worldwide that would be qualified to meet its authorized dealers' printing needs.

No. 10–20023

## III

Ford appeals the district court's dismissal of its dilution claim. Ford specifically disputes the district court's finding that NBFP did not "use" Ford's marks under the Trademark Dilution Revision Act, 15 U.S.C. § 1125(c) ("TDRA") by its manufacture and sale of products bearing Ford marks.[5]

The TDRA bars another person's commercial "use of a mark or trade name in commerce [in a manner] that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of the actual or likely confusion . . . ." 15 U.S.C. § 1125(c)(1). To state a dilution claim under the TDRA, Ford must show that (i) it owns a famous and distinctive mark; (ii) that NBFP has commenced using Ford's marks in a manner that dilutes those marks; (iii) that the similarity between NBFP's marks and the Ford marks gives rise to an association between the two marks; and (iv) that the association is likely to impair the distinctiveness of the Ford marks or harm the reputation of the Ford marks. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 264–65 (4th Cir. 2007). We review the trial court's findings on the issue of trademark dilution for clear error. *See Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 671 (5th Cir. 2000).

The district court entered just two factual findings relating to Ford's dilution claim: (i) that the Ford Oval and the Ford Script logo are both famous marks; and (ii) that NBFP, in filling orders it received from used car dealers unaffiliated with Ford, did not use the Ford Oval or Ford Script logo to identify or distinguish any of NBFP's own goods and services. The court then concluded that because the TDRA contains a trademark use requirement, *see* 15 U.S.C. § 1125(c), and NBFP had not made a "use" of the Ford marks in identifying its own goods or services, Ford had failed to establish a necessary element of its

---

[5] NBFP's briefing fails to develop this issue.

12

dilution claim.   The court did not address the class of orders placed by authorized dealers.

The issue here is essentially whether a commercial printer "uses" a trademark under § 1125(c)(1) when it reproduces or offers to reproduce the mark for customers as part of its printing business.   This issue is one of first impression in this circuit.  The district court found that NBFP did not make use of the Ford marks as envisioned by § 1125(c)(1) because NBFP had not appropriated Ford's marks as its own.

Under the TDRA, a "trade name" is "any name used by a person to identify his or her business or vocation," while the term "trademark" denotes "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods."   15 U.S.C. § 1127.  We agree with the district court that NBFP did not "use" Ford's marks (as the TDRA contemplates that term) in identifying or distinguishing its own goods or services merely by reproducing them for customers as part of its commercial printing business.[6]  *See* Stacey L. Dogan & Mark A. Lemley, *The Trademark Use Requirement in Dilution Cases*, 24 Santa Clara Computer & High Tech L.J. 541, 551–52 (2008).  Congress did not unequivocally include commercial printers within the scope of  § 1125(c)(1), and we refuse to read the statute in such a manner.[7]

---

[6]   Ford contends that the district court failed to enter adequate findings and conclusions.  Given our holding that NBFP's activities do not constitute "use" under the TDRA, we disagree.  The district court's findings and conclusions are adequate to dispose of Ford's dilution claim.

[7]   Our holding does not conflict with our understanding that printers may be liable for infringement under the Lanham Act.  The Lanham Act specifically contemplates liability for printers in its limitation of remedies for innocent infringers; it further extends this limitation to claims of false designation of origin under § 1125(a) and claims of cyberpiracy under § 1125(d).  *See* 15 U.S.C. § 1114(2).  But no such limitation applies to dilution claims under § 1125(c).  *See id.* (making no mention of § 1125(c)); *see also* 15 U.S.C. § 1125(c)(3) (excluding from dilution claims fair use, news reporting and commentary, and noncommercial uses of a

No. 10–20023

**IV**

Next, we consider whether the district court incorrectly denied Ford's request for attorney's fees, as Ford asserts.[8]

The Lanham Act permits a court to award reasonable attorney's fees to a prevailing party "in exceptional cases." 15 U.S.C. § 1117(a). To demonstrate that this case is "exceptional", Ford must show that NBFP brought its declaratory judgment action in bad faith. *See Scott Fetzer Co.*, 381 F.3d at 490. Alternatively, Ford may show that NBFP's violative acts were "malicious, fraudulent, deliberate, or willful." *Pebble Beach Co.*, 155 F.3d at 555. But, we caution, even deliberate copying of a mark does not automatically make a case "exceptional." *Id.* at 556. A party does not act in bad faith, moreover, simply because a controversial or unsettled legal theory undergirds the claims it pursues. *Scott Fetzer Co.*, 381 F.3d at 490. "A district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense." *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 66 (5th Cir. 1992). We review the district court's determination as to whether a case is "exceptional" under § 1117(a) for clear error, but we review the lower court's ultimate decision not to award attorney's fees for an abuse of discretion. *See Smack Apparel*, 550 F.3d at 490–91.

The district court concluded that this was not an "exceptional" case for Lanham Act purposes, *see* 15 U.S.C. § 1117(a), based on the court's findings that NBFP and its president and founder, George Atkinson, brought this suit in good faith on what they reasonably believed to be a legitimate defense to Ford's claims of trademark infringement. Ford contends that we must reject this finding as clearly erroneous in light of the district court's earlier, conflicting

mark).

---

[8] NBFP fails to meaningfully develop its opposition to this issue in its briefing.

14

findings that NBFP's use of the Ford marks "constitute[d] the use of a counterfeit mark," and that NBFP "did not have an objectively reasonable belief . . . that the promotional materials bearing Ford's logos and marks . . . complied with trademark law."

But the issues of whether NBFP's products were counterfeits and whether NBFP had an objectively reasonable basis for selling to non-authorized dealers (for purposes of calculating damages), are measured objectively; in contrast, the issue of evaluating good faith for establishing the exceptional nature of a case for § 1117(a) purposes includes a subjective component. *See King v. PA Consulting Group, Inc.*, 485 F.3d 577, 592 (10th Cir. 2007). Here, the district court did not clearly err in finding a lack of the requisite level of culpability; NBFP's websites contained unmistakable disclaimers as to source and sponsorship; NBFP offered legitimate uses of the Ford marks (e.g., the "NO BIG 3 BAILOUT" decal and other fair uses); and the record evidence shows that NBFP's president attended many trademark law seminars for the purpose of conducting his printing business within the bounds of the law.

Ford also contends that NBFP's willful infringement is demonstrated by its previous stipulation to an injunction in a similar case. *See Joy Mfg. v. CGM Valve & Gauge*, 730 F. Supp. 1387, 1392 (S.D. Tex. 1989) (infringement "deliberate and willful" where defendant continued to place counterfeit nameplates on reconditioned valves despite having been enjoined from doing so in earlier suits by other manufacturers). But that settlement agreement bears little probative weight on NBFP's subjective belief that it was, in fact, guilty of trademark infringement in that collateral matter. Any number of ancillary concerns could have motivated its decision to settle. NBFP maintains that it sued Ford for the specific purpose of obtaining a judicial ruling on whether its business activities ran afoul of the trademark laws. No evidence suggests another motive for its action. The district court did not clearly err in finding

No. 10–20023

that this was not such an exceptional case as to justify an award of attorney's fees; nor did it abuse its discretion by not awarding Ford attorney's fees.

## V

Last, we consider whether the district court abused it discretion in denying NBFP's post-trial motion to amend its complaint. NBFP argued in the district court, as it does here, that the parties impliedly tried an antitrust claim.

FED. R. CIV. P. 15(b) governs amendments to pleadings during and after trial. The Rule provides that issues litigated by express or implied consent are "treated in all respects as if they had been raised in the pleadings," and any relevant amendments of the pleadings may be made upon any party's motion "at any time, even after judgment." FED. R. CIV. P. 15(b)(2). In determining whether parties tried an issue by implied consent, the court considers (i) whether the parties recognized that the issue entered the case at trial; (ii) whether the evidence supporting the issue was introduced at trial without objection; and (iii) whether a finding of trial by consent would prejudice the opposing party. *See Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004). We review a district court's Rule 15(b) ruling for abuse of discretion. *Id.* at 595.

Based on the record, all three factors support the district court's finding that the parties did not try NBFP's purported antitrust claim by implied consent. As the district court noted, NBFP alluded to a potential antitrust claim in several pretrial pleadings, but never sought leave to amend its complaint earlier in the proceedings. The district court found, and we agree, that this fact is highly suggestive of NBFP's decision not to go to trial on such a claim. Moreover, the district court observed that even if it had allowed NBFP to amend its complaint, the trial record did not contain evidence supporting a tying arrangement, as would be necessary to support NBFP's antitrust claim. We find no abuse of discretion in the district court's Rule 15(b) ruling.

16

No. 10–20023

## VI

For the reasons above, the district court's grant of partial summary judgment to Ford is AFFIRMED.  Because there is no likely threat of consumer confusion as to NBFP's sale of products bearing the Ford marks to three independent used car dealers, we REVERSE the district court's judgment finding that NBFP's sale of these products amounted to trademark infringement, and we REMAND to the district court with instructions to enter judgment for NBFP on this category of products.  We AFFIRM the district court's judgment in all other respects.